UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


BIRD PEAK CORPORATION, ET AL.,    :
Plaintiffs


                    v.                    :        CIVIL NO. 3:02CV1553 (WWE)


LAWYERS TITLE INSURANCE        :        OCTOBER 27, 2003
CORPORATION,
Defendant.


PLAINTIFFS  MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR STAY OF JUDGMENT
PENDING APPEAL


Facts Underlying The Plaintiffs  Claims.

A brief summary of the factual allegations underlying the claims made by the plaintiffs in

this action will assist the Court in its understanding of the arguments made in support of

their motion.

The history of this litigation begins in 1993, when the IPPEC Corporation (a corporation

related to the plaintiffs and which takes its name from spelling  Ceppi  backwards)

contracted to purchase a parcel of approximately 400 acres of unimproved real property in

Salisbury, Connecticut from a local bank which had acquired it through foreclosure.

After a purchase agreement had been signed, the IPPEC Corporation, through its representative, Dario Ceppi, began discussions and negotiations with the defendant s representative, Steven Winkler, relating to the terms and conditions upon which the defendant would insure title to the property being purchased.  Communications between these two individuals spanned a period of many months prior to the closing of title, which occurred on November 30, 1993.

A major issue for IPPEC, known to both individuals prior to the closing, was whether fee simple title to a road serving the entire property and necessary for its development, would be conveyed by the seller.  Indeed, shortly before the dosing, a third party had actually recorded a deed to the road, had notified the seller of the property of the deed s execution and furnished it with a copy of the deed.  The seller in turn faxed a copy of this deed directly to Mr. Winkler, who repeatedly assured Mr. Ceppi that the deed was a nullity and could have no effect on the seller s conveyance of fee simple title to the road and who ultimately committed the defendant to insure explicitly that fee title to the road would indeed be received.

In the course of the foregoing discussions, Mr. Winkler also recommended that the conveyance by the seller, which initially was to be a single conveyance to a single buyer, be executed differently for zoning reasons.  This recommendation resulted in an artificial division of the property and its eventual conveyance in pieces to the three plaintiffs in this

action.  Though each plaintiff received a policy of title insurance from the defendant, each
policy insured only the specific parcel conveyed to each plaintiff and it was only the policy
issued to the Bird Peak Corporation that insured the fee ownership of the road.  The
amount of insurance written by the defendant for the various conveyances exceeded the
purchase price paid for the property.  The defendant s actual policies, and the actual
commitments on which they were based, were delivered to Mr. Ceppi several months after
the closing.

In April, 1994, the adverse claimant commenced a lawsuit in Connecticut Superior
Court seeking to quiet title to the road in it and prevailed in the trial court and in the
appeal that was subsequently taken.  Ownership of the road, therefore, does not lie in the
Bird Peak Corporation and title to the road is not as insured by the defendant.

The litigation involving ownership of the road was conducted over a period of seven
years and was prosecuted and paid for by the defendant, through counsel selected by it.
On several occasions after the commencement of litigation by the adverse claimant, the
defendant specifically indicated to the plaintiffs that its liability to them was based only on
the policy it had issued to the Bird Peak Corporation and was limited accordingly.

At no time during his near daily pre-closing communications with Mr. Ceppi did Mr.
Winkler ever indicate that the documents that the defendant would eventually furnish
would contain a provision calling for arbitration of disputes between the defendant and an
insured, despite the heightened risk of such a dispute because of the known adverse

3

claimant.  Nor did he mention that the defendant did, on occasion, delete the arbitration

clause from its policies at the request of an insured, all of which information would have

been particularly useful given the situation that existed.

After the litigation involving the road had been concluded, and the plaintiffs

preliminary requests to the defendant for payment of their losses were rebuffed, all plaintiffs

commenced this action for damages, which is based not only on the policies issued to the

Bird Peak Corporation and Aleardo Ceppi, but also on common law and statutory grounds

advanced by all of them.

A brief review of the allegations made with respect to the claims not based on the

policies will help the Court evaluate some of the arguments made below.  Again, the

transaction as initially conceived called for IPPEC Corporation to receive the whole of what

the seller was conveying.  This was changed at the defendant s recommendation so that,

ultimately, the property conveyed was divided and conveyed separately to the three

plaintiffs in this action.  Given the defendant s current insistence that only the plaintiff, Bird

Peak Corporation, has a claim by virtue of title to the road not being as insured, this

recommendation appears in hindsight to be an effort by the defendant to limit its liability in

the event its assurances about ownership of the road proved to be incorrect, though it at all

times knew that its insureds intended that the road benefit the whole of the property being

conveyed by the seller and not just the parcel arbitrarily carved out to Bird Peak.

Additionally, the defendant never advised the plaintiffs that the policies they would

eventually receive would contain arbitration clauses, though it did point out the existence

of clauses that might produce an immediate benefit to it.  As an example, the

defendant did tell the plaintiffs that the amount of insurance that could be purchased could

exceed the purchase price for the property.  While it is true that knowledge of this feature

could help the plaintiffs, it is also true that its exercise necessarily meant payment of a

higher premium.

After the issue regarding ownership of the road became concrete by the commencement

of a lawsuit by the adverse daimant, the defendant behaved in a manner completely at

odds with the pre-closing assurances made by Mr. Winkler and, after the loss in the

Appellate Court, the defendant unconscionably denied that the plaintiffs suffered any loss

at all.  For example, while engaged in litigation with the adverse claimant, the defendant

agreed that certain steps needed to be taken to attempt to establish title to the road and

then failed to take them.  When settlement discussions were underway with the adverse

claimant, the defendant undermined them by insisting that the plaintiffs contribute

financially to the cost of the proposed settlement.  When the litigation finally ended and

title to the road was conclusively established to lie in the adverse claimant, the defendant

indicated to the plaintiffs that they had forfeited any right to be paid under the Bird Peak

policy because they had not furnished a proof of loss, even though in the course of the

litigation that had spanned seven years the defendant gained intimate knowledge of the

value of the property with and without fee ownership of the road.  It defies credibility to

imagine the defendant saying that it had no information on which it could evaluate the magnitude of the loss and is outrageous to hear it say that the plaintiffs suffered no loss when it had just spent seven years worth of time and resources to attempt to establish ownership of the road to the Bird Peak Corporation.

The foregoing establishes the defendant s wrongful, tortious and outrageous conduct in this case. Prior to the closing, it threw caution to the wind, touted its expertise and painted a rosy picture for the plaintiffs on which they relied in completing the transaction with their seller. When it came time to make good on its assurances, however, the defendant made less of an effort than even it acknowledged was necessary and when it eventually lost the case, it turned its back on the plaintiffs by refusing to pay them for their losses.

Argument.

In determining whether a stay pending appeal is warranted, the Court needs to consider and weigh four factors: (1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected. *Hirschfeld v. Board of Elections*, 984 F.2d 35 (2nd Cir. 1992) (internal quotations omitted). The movant need not establish

each of the four elements.  If the arguments for one factor are particularly strong, a stay

may be granted even though the arguments for the remaining factors are weaker.  *CityFed*

*Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738 (D.C. Cir. 1995).


I.  The Plaintiffs Will Suffer Irreparable Injury Absent A Stay.

Unless the plaintiffs  motion is granted, they will be forced to proceed with arbitration.

The same reasons for which the plaintiffs earlier sought and received a stay from this Court

while the defendant s motion to dismiss and the plaintiffs  objection to the same were

pending apply with equal force to the instant motion.  There are no urgent or compelling

reasons why the arbitration has to proceed while plaintiffs exercise their right of appeal

and, indeed, forcing them into arbitration at this point will effectively deny them their right

of appeal.  It is clear that a party objecting to arbitration is irreparably harmed if he can be

forced to participate in an arbitration proceeding before his obligation to do so has been

finally established:

> The plaintiffs were facing a situation in which they would have had
> to arbitrate claims that they did not agree to arbitrate if they did not
> obtain judicial intervention.  The defendants had actually begun
> arbitration proceedings with the American Arbitration Association. . . .
> If the plaintiffs had been forced to proceed with arbitration they
> would have suffered irreparable harm. . . .  The plaintiffs would have
> been forced to spend time and money defending claims that they
> did not agree to arbitrate.  This would have resulted in irreparable
> harm to the plaintiffs, . . . .  *Scinto v. Sosin,* 51 Conn.App. 222,
> 245-246 (1998).

While it is true that this Court has determined that the plaintiffs do indeed have to arbitrate their disputes with the defendant, the same factors that supported a stay of arbitration while this Court determined the issues between the parties likewise support a stay while the plaintiffs prosecute their appeal.  In addition, the defendant litigated the ownership of the road for a period of seven years, as it was permitted to do under the policy it issued to the Bird Peak Corporation, while the plaintiffs patiently awaited the ultimately disappointing outcome.  In all fairness, the plaintiffs should be permitted to take a fraction of that time to exercise their appeal rights without being rushed into the arbitration proceeding initiated by the defendant after the plaintiffs commenced this action.

II.  There Is A Substantial Possibility That The Plaintiffs Will Succeed On Appeal.

A.  There Is No Basis For Concluding That The Plaintiff, Ecolake Corporation, Agreed To Arbitrate Any Of Its Disputes With The Defendant.

This Court has indicated that all four counts of the plaintiffs complaint not only make reference to the title insurance policies or defendant s performance under those policies, but they are firmly grounded in those policies and/or performance of them. Recommended Ruling, p. 8.

A basic fact underlying the plaintiffs disputes with the defendant is that title to a road

serving the property owned by the plaintiff, Bird Peak Corporation, was not as insured by

the defendant.  That is, the defendant insured that the Bird Peak Corporation would be the

fee owner of the road in question, but it was eventually determined by the Connecticut

Appellate Court that Bird Peak did not own the fee to the road.

The plaintiffs allege in their complaint that, initially, there was a single buyer for the

entire tract being purchased from the New Milford Savings Bank and that, upon the

defendant s recommendation, the entire parcel was artificially divided and conveyed in

portions to the original buyer s nominees, the plaintiffs in this action.   As a result of that

division, the defendant claims that only the Bird Peak policy insured the ownership of the

road.  A copy of the Bird Peak policy is attached to the plaintiffs  complaint as Exhibit 2.

Page 13 of that exhibit indicates that the defendant insured  the fee to the roadbed

underlying such 60' and 50' rights of way and the turnaround, . . .   Further, while the

policy issued to Aleardo Ceppi did not insure to him ownership of the road, it did insure to

him a right-of-way which has been compromised by Bird Peak s loss of fee ownership of

the road.  Thus, these two plaintiffs definitely have claims for indemnity against the

defendant arising out of the title that was insured to them under their respective policies.

The claims of the Ecolake Corporation, however, technically do not arise under its policy

since that policy does not insure to it the fee ownership of the road.  Of course, should a

court eventually decide to treat the three policies as one and essentially consider the case

as one involving a claim under a single, unified policy, then the analysis here would

change.  For now, however, this plaintiff is suing the defendant but is doing so on the

theory that its rights in its parcel have been impaired or diminished by the failure of title

under the other two policies and that the defendant, in recommending that title to the

property be conveyed in pieces, breached its obligation to see that this happened in a

manner that would not prejudice any plaintiff in terms of the value that a conveyance of

the fee ownership of the road would have had for its separate parcel and not on the basis

that its policy obligates the defendant to indemnify it.  Of course, a court might later

interpret the policy in such a way that Ecolake s claims are deemed to arise under its policy

but, at this juncture and on the basis of the Ecolake policy and the plaintiffs  complaint,

Ecolake s claims are not technically being made on its policy.  Accordingly, any liability of

the defendant to it will arise in some way other than the policy and it cannot be said to

have agreed to arbitrate its claims against the defendant.

In fact, when the litigation involving the road started in 1994, the defendant specifically

indicated that the adverse claim involved only the policy issued to the  Bird Peak

Corporation and that, further, the plaintiffs Ecolake Corporation and Aleardo Ceppi had

no claims under their policies because fee ownership of the road was insured only under

the policy issued to the Bird Peak Corporation.  For purposes of its motion to dismiss,

however, the defendant took the new position that all of the plaintiffs  claims arise under

their respective policies.  The defendant cannot have it both ways.  Its earlier statements to

the plaintiffs clearly contradict the position it has adopted for purposes of its motion to

dismiss, which is belied by the policies themselves.

B.  The Court Erred In Rejecting The Plaintiffs  Claims That No Agreement To Arbitrate
Was Ever Created Or That The Connecticut Statute Of Frauds Rendered Any Such
Agreement Unenforceable.

It was necessary to consider both state and federal law in considering the plaintiffs

claims that no valid agreement to arbitrate was created or that the arbitration provision is

unenforceable:

> . . . , while the FAA creates a  body of federal substantive law of
> arbitrability, applicable to any arbitration agreement within the
> coverage of the Act,  *Moses H. Cone Mem l. Hosp. v. Mercury
> Constr. Corp.,* 460 U.S. 1, 24 (1983), in evaluating whether the
> parties have entered into a valid arbitration agreement, the court
> must look to state law principles.  See, e.g., *Doctor s Assocs., Inc.
> v. Casarotto,* 517 U.S. 681, 687 (1996) (noting that  [g]enerally
> applicable contract defenses, such as fraud, duress, or
> unconscionability, may be applied to invalidate arbitration
> agreements without contravening § 2 [of the FAA] ); *Perry v.
> Thomas,* 482 U.S. 483, 492-93 n. 9 (1987) ( state law, whether
> of legislative or judicial origin, is applicable [in a FAA action] if
> that law . . . govern[s] issues concerning the validity, revocability,
> and enforceability of contracts generally ).  *Capgemini Ernst &
> Young v. Nackel,* (2d Cir. 2003).

First, as a matter of the federal substantive law of arbitrability, the Court erred when it

indicated that  the argument that the arbitration provisions are unenforceable is belied by

the plaintiffs own complaint, which asserts several claims based on the assumed

enforceability of the policies of which the arbitration provisions are a part  and that  the

arbitration clauses are not free-standing agreements; they are integral components of the

policies which are binding on all parties.   Recommended Ruling, p. 5.

The Court s approach to the issue makes each and every provision of a contract valid

and enforceable so long as no challenge is made to the validity or enforceability of the

contract as a whole.  This approach is contrary to both federal and state law.  As a matter

of the federal substantive law of arbitrability, the  severability doctrine  draws a clear

distinction between an arbitration clause and the whole contract of which it is a part.

Long-established judicial interpretation of the Federal Arbitration Act clearly isolates the

arbitration clause, both for analytical and substantive purposes, from the contract in which

it is contained.   . . . the doctrine of severability presumes an underlying, existent

agreement , *Sandvik AB v. Advent International Corp.* 220 F.3d 99, 106 (3rd Cir. 2000),

and the federal courts will only entertain a challenge to an  arbitration provision which is

*separate* and *distinct* from any challenge to the underlying contract.  *Teledyne, Inc. v.*

*Kone Corp.*, 892 F. 2d 1404, 1410 (9th Cir. 1989) (italics in original).

Thus, the existence of an underlying agreement is merely the starting point for the

analysis and it was improper to conclude, as the Court did here, that the existence of the

policies upon which two of the plaintiffs indisputably have claims for indemnification

translated into an assent to the specific arbitration provisions even by those plaintiffs, much

12

less assent to arbitration by the remaining plaintiff who is not making a claim for indemnity

under the policy issued to it.    And there are numerous instances where a party has

disputed an obligation to arbitrate while at the same time acknowledging the validity of the

contract which contains the disputed arbitration clause.  See, *e.g., Sandvik, id.* at 100 ( the

  party suing on a contract containing an arbitration clause resists arbitration, . . . ).  In

addition, the common law of Connecticut has long allowed a party to challenge portions of

a contract while accepting its benefits and acknowledging the validity of the contract as a

whole.  Illustrations of this are found in *Beit v. Beit,* 135 Conn. 195 (1948), where the

vendor of a grocery business was permitted to retain the consideration he received for the

sale of his business while at the same time having a covenant not to compete given as part

of his agreement declared invalid and unenforceable, and *Griffin v. Nationwide Moving &*

*Storage Co.,* 187 Conn. 405 (1982), where a bailor of personal property was held not

bound by contractual limitations attempted to be enforced by her bailee even though she

had received the contractual documents containing the same.  Thus, it is clear that, under

both federal and Connecticut law, a party who fails to challenge the validity of an entire

contract does not automatically bind himself to each and every provision in the contract.

An acceptance of the whole does not mean an acceptance of each part.

Second, it is not necessarily true, as a matter of Connecticut law, that a party who

receives a written document necessarily assents to all of its provisions.  In addition to the

*Beit* and *Griffin* cases mentioned above, the case of *Diulio v. Goulet*, 2 Conn. App. 701

(1984) is instructive.  There, a race track patron brought suit for personal injuries despite

having signed a release of liability in favor of one of the defendants before she entered the

track.  The Court indicated that a question of fact existed as to whether the plaintiff

assented to the terms of the instrument she signed in light of statements contained in her

affidavit that she was rushed and had no time to read the terms of the instrument and,

accordingly, denied summary judgment to the defendant to whom the release was given.

The Court did indicate that a public policy question as to the validity of the release existed

as well, but it did not address that issue and disposed of the case on basic contract

principles pertaining to the assent necessary to form a contract.

Here, no plaintiff has signed any of the policy documents issued by the defendant and

there is uncontroverted testimony that no plaintiff received a policy containing the terms

and conditions, including the arbitration clause, found on the policy jackets until several

months after the closing and that the plaintiffs  representative was not told of the existence

of the arbitration clause at any time prior to the plaintiffs  receipt of their policies.  In

addition, within perhaps two months of the time the plaintiffs received their policies, the

plaintiff, Bird Peak Corporation, was sued by a third party claiming title to the subject road.

This is significant and bears on the assent issue because the defendant knew in advance of

the time of closing that there was an actual, adverse claimant to the road and, thus,

certainly knew that it was likely to be in a situation where its insured would be making a

claim under the policy if it could not defeat the adverse claim.  In light of this knowledge,

the defendant should have advised the plaintiffs both of the existence of the arbitration

clause, and the possibility of its deletion, because it was definitely foreseeable that the

defendant and the plaintiffs would be in an adversary situation if the defendant could not

establish in court the validity of its opinion that the adverse claim to the road was

insignificant and unsustainable.

These, and other issues pertaining to the plaintiffs assent to the arbitration clause, were

disposed of by the Court on the basis that the plaintiffs necessarily accepted the clause

since it is contained in the contract upon which suit has been brought.  However, as

explained above, the matter of assent under Connecticut law is not resolved that easily.

The factual circumstances surrounding the plaintiffs receipt of the policies and their

knowledge of the presence of the arbitration clause are clearly relevant to the issue of

whether the plaintiffs accepted the clauses, yet were not considered by the Court.  There

was ample evidence before the Court, including the testimony of Messrs. Ceppi and

Winkler and the affidavit of Mr. Ceppi, from which the Court could have made findings as

to whether assent was in fact given, yet it seems simply to have inferred assent from the

fact that a suit was brought on a policy.  In the plaintiffs view, there was too little fact-

finding by the Court, in view of the evidence before it, for a proper consideration of the

plaintiffs claims.  See, *e.g.*, *Mag Portfolio Consult v. Merlin Biomed Group*, 268 F.3d 58

(2nd Cir. 2001) (as here, a dispute over arbitration, in which the case was remanded for